**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Appeal of Stephen Dana               }
                                     }
                                     }       Docket No. 66-4-03 Vtec
                                     }
                                     }

<u>Decision and Order</u>

Appellant Stephen Dana appealed from a decision of the Development Review Board (DRB) of the Town of St. Albans, approving Appellee-Applicant Shantee Point Estates, Inc.'s application for approval of a relocated private access road under the subdivision regulations. Appellant is represented by Brian P. Hehir, Esq.; Appellee-Applicant is represented by Lisa B. Shelkrot, Esq.; and the Town of St. Albans is represented by David A. Barra, Esq.

Questions were resolved on summary judgment so that the only issues remaining for trial were the project's compliance with § 220(4)(first phrase) and § 221(2). An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

As discussed in several prior orders in earlier litigation involving this project, Appellee-Applicant Shantee Point Estates, Inc. owns a 25.35-acre parcel of land on Shantee Point in St. Albans, adjoining Appellant's land. Access from the public road (Maquam Shore Road) runs from the north towards the south across one portion of Appellant's property, along a private gravel roadway to the boundary with Appellee-Applicant's property. The former roadway then continued along Appellee-Applicant's property close to the shore of Lake Champlain, providing access to the houses on Appellee-Applicant's property. The roadway then branched at a triangular intersection, with one extension continuing towards the south along another portion of Appellant's property, to serve property at the end of the point, and another gravel roadway turning to the east and providing access to property along Lapan Bay.

Appellee-Applicant sought to relocate the roadway away from the lakeshore but within its property, so that the roadway would turn to the east close to the property's northerly boundary, and then turn to the south again to the rear of the leased lots, proceeding southerly to rejoin the existing roadway branches at the triangular intersection.

Prior litigation established that approval under the subdivision regulations was required for the right-of-way for this roadway, as it was the extension of a road to serve more than two lots. See § 200.2 of the Subdivision Regulations. While nothing in that prior litigation required Appellee-Applicant actually to subdivide the right-of-way of the roadway as a second lot, Appellee-Applicant does propose to do so. This subdivision divides Appellee-Applicant's property into two lots: a 1.9-acre L-shaped lot containing the road right-of-way and the remaining 23.5 acres of Appellee-Applicant's land. We will refer to the roadway in question as "the subdivided roadway" rather than by any other terminology used in prior litigation, to avoid confusion.

A portion of the subdivided roadway was constructed in 1997; the remainder of it (sometimes referred to as the " connector" portion) was constructed or reconstructed in 2003. The roadway was constructed in conformance with its approved site plan. The traveled way of the subdivided roadway is from 14 to 17 feet wide. The radius of the turn from the existing roadway on

Appellant's property onto the subdivided roadway at its northerly end is 44 feet. The radius of the turn from the subdivided roadway onto the branch of the roadway turning to the east at the triangular intersection is also 44 feet. At the triangular intersection, the subdivided roadway continues straight in a southerly direction onto the other branch of the road serving the point. The traveled way of the subdivided roadway is at least equal to and may exceed in quality and width the traveled way of the existing roadway across Appellant's property to the north of the subdivided roadway. The traveled way of the subdivided roadway exceeds in quality and width the traveled way of the existing roadway to the south of the subdivided roadway.

The subdivided roadway serves a total of approximately 30 residences in the summer season and approximately five in the winter. None of the structures served by the subdivided roadway is tall enough to require a ladder truck for adequate fire protection. A pumper truck is the largest of the remaining types of fire equipment that would potentially use the subdivided roadway; it has a turning radius of under 44 feet and could negotiate all the turns needed to utilize the subdivided roadway for access to any of the 30 lots. It could turn around safely at the triangular intersection by executing a three-point turn, as the tree impeding that motion has been removed and additional gravel has been placed in its place. No traffic congestion is caused by the existing traffic and no congestion would be added by the subdivided roadway as compared with the former lakeshore roadway.

Dimensional subdivision requirements

The subdivided roadway meets all the dimensional requirements for a subdivision lot. While if it did not contain a roadway it would not have sufficient continuous frontage of 150 feet (although its two segments of ' frontage' add to more than that amount); in fact the subdivided roadway lot contains a roadway along its entire length and therefore meets the frontage requirement as well.

Section 220(4)(first phrase)

In determining whether the subdivided roadway avoids causing " unreasonable congestion or unsafe conditions on the affected public or private roads," we must compare the traffic conditions existing when the former lakeshore road was in use, as compared with the use of the new subdivided roadway. The subdivided roadway does not itself create any new lots or any new houses or any new conversions from seasonal to year-round use, and therefore does not create any additional traffic and has no effect on the nearest public road.

With respect to the private roads to which it connects, the subdivided roadway also does not cause any congestion or unsafe conditions.

Section 221(4)

Section 221(4) requires that " design of roads shall conform to Selectmen approved standards and shall be constructed logically in relation to the topography so as to produce safe intersections, grades and alignments, and adequate drainage." Prior litigation has already established that no selectboard-approved road standards apply, as this roadway is a private roadway and is not being proposed to be taken over by the Town. The subdivided roadway is constructed logically in relation to the fairly flat topography. Its intersections, grades and alignments, to the extent that they differ from those of the former lakeshore roadway, are safe. The subdivided roadway has adequate drainage, indeed, it is far more adequate than was the former lakeshore roadway.

Section 221(4) goes on to require that, wherever feasible, roads " shall be laid out (A.) to coordinate with existing and future appropriate development of adjacent tracts; (B.) to utilize intersections that provide the highest Level of Service (LOS) and safety; (C.) to make driving

through the development possible (i.e.: to avoid long dead-end streets), but discouraging to through traffic in that portion of the Town; and (D.) to enable safe pedestrian and bicycle access and movements. Provision for sidewalks and crosswalks shall be required in . . . designated growth centers." We take each of these requirements in turn.

The subdivided roadway is laid out to coordinate with existing and future appropriate development of adjacent tracts. It is an improvement in quality with respect to the former lakefront roadway and connects with the existing roadways on either end.

The subdivided roadway is laid out to utilize intersections that provide the highest Level of Service and safety. It improves the triangular intersection by changing the radius of curvature of the eastern branch to a 44-foot radius, improving the safety of that intersection[1]. It improves the safety of the roadway as compared to the former lakeshore roadway by adding the 44-foot radius turn at its northerly end, slowing traffic down as compared with the temptation to accelerate down the lakeshore straightaway.

The subdivided roadway is laid out to make driving through the development possible and equally as convenient as the former lakeshore roadway. No through traffic passes over the subdivided roadway as both branches of the road beyond the subdivided roadway are dead ends.

The Shantee Point area is not a Town-designated growth center, and therefore sidewalks and crosswalks are not required. The subdivided roadway is laid out to enable safe pedestrian and bicycle access and movements, in that there is ample room and adequate sight distances on it for safe pedestrian and bicycle use and its design causes traffic to be moving more slowly than along the former lakeshore roadway.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the subdivided roadway is approved as designed and constructed.

Dated at Barre, Vermont, this 18th day of October, 2004.


_____
Merideth Wright
Environmental Judge

---

### Footnotes

[1]  In winter, snow must be plowed sufficiently far from the intersection so as not to obstruct any of the turning movements at the intersection. This is a maintenance issue, however, not an issue with the design of the subdivided roadway.